We'll proceed to our next case this morning, South Branch v. Commonwealth Edison. All right, Mr. Selbin. Yes, good morning. May it please the Court, Jonathan Selbin on behalf of appellants, plaintiffs, the Illinois Electricity customers. We are here today on a RICO suit between private parties brought by the direct, intended, and only victims against the wrongdoer, ComEd, seeking a private damages remedy. This case does not take aim at or interfere with state law and would have no effect on state law. Are your clients really the only victims? What about the other customers of other energy companies in Illinois? Wouldn't they be victims as well? Yes, Your Honor, they would be victims as well. It's a good question. Ameren customers and other customers who actually paid the same rates as a result of the passage of the statutes. And in fact, in the companion state court case, which is proceeding at the same time, although now on appeal there too, there actually is a claim that has added the claims of Ameren customers against ComEd for precisely that reason. And so ultimately, that would be something that we would probably do if we're back on remand in district court here is to add the claims of Ameren and the other customers because they too suffered the same harm. I asked that question because I want to make sure you leave time to address the filed rate doctrine. Yes, absolutely. Absolutely. Three issues. You've just identified one of them, the filed rate doctrine. I will probably spend most of my time on that, but I feel the need to address briefly the two other issues, the Fletcher v. Peck issue and the RICO proximate cause issue. We believe that the Empress line of cases, and I know Judge Sykes, you're familiar with those cases, having sat on a number of those panels. Those cases address and dispose of the first two issues, the sweep of Fletcher v. Peck and the proximate cause issue. If Fletcher v. Peck was a bar to these kinds of claims at the motion-to-dismiss stage, none of the claims in Empress Casino would have proceeded past the motion-to-dismiss stage. But in fact, they proceeded past the motion-to-dismiss phase and were upheld in the original panel opinion. There was then an en banc opinion that applied a jurisdictional bar to one piece of the claims that were held to be aimed at state action, which is not something we have here, and allowed to go forward ultimately on one of the two claims on summary judgment, and that's the second panel opinion in the case. So we believe that the Fletcher v. Peck issue is resolved by Empress because it is not the bar, the absolute bar, that the district court held and that ComEd argues for here. And if it were, there would be cases still holding elsewhere. There's not a single case that anybody was able to find on that point. But the proximate cause analysis in the second Empress Casino opinion, the 2014 panel opinion that permitted one aspect of that case to proceed regarding the 2008 Casino Act or Racetrack Act, the racetracks for the beneficiaries, the proximate cause analysis of that one claim that was permitted to proceed because the opinion said nothing else can go forward because of a failure of proximate cause, but one claim can go forward. That analysis doesn't really map on to this case very well because we have corruption that resides in one member of a multi-member body, not, as in that case, the governor who had the singular authority to either sign or not sign the act. I guess I have two responses, Your Honor. The first is that it was ultimately a failure of proof in that second opinion at summary judgment. And so I think that distinction matters because we've pled that that singular person, Mike Madigan, had that same kind of authority. So I think there's a pleading versus summary judgment standard that matters there. But the second issue is that that same opinion says whether the governor or anybody else hijacks the process. If Mike Madigan isn't the anybody else who had the authority and the power to be the gatekeeper of whether something passed or not, I'm not sure who else could be. And so I think that we've alleged precisely the same power, albeit not residing in the governor, residing in Mike Madigan who, by our allegations, was not only in control of the assembly but in control of the Democratic Party machine and so therefore was able to decide essentially as a gatekeeper, either it passes or doesn't. And the reason we know that matters is because that's why they bribed him. They bribed the one guy who could do this. And they admitted that they bribed the one guy who did this. But there's much more, there are many more inputs into the legislative process than Speaker Madigan and his power. Yes, ultimately there were. Which granted was significant. Ultimately there were. Now that's when we get into the issue of did more things have to happen or did more unexpected things have to happen? The district court said, well, more things had to happen. And because more things had to happen in the legislature, then there's a problem of proximate cause. But the fact that more things have to happen isn't the test. The test from, I believe it's BCS, is did more unexpected things have to happen? Everything that happened after the gatekeeper with that power opened the gate was expected. It was foreseeable. It was known. They didn't have to go bribe everybody down the line once they did that. And if the law required that, then you would require a sole cause, not proximate cause. And so when you take a look at cases like, I believe it's the Bridge case that points out, when you've got the direct and only intended victim suing the wrongdoer, the fact that more things have to happen isn't a defense. And, I would add, the burden's on the defender to show those things. We're at a motion-to-dismiss stage. So we've pled it. We've pled that that bribery, which they've admitted to, caused the statute to pass, which caused the harm. They can speculate about intervening causes, but that speculation is a defense. The burden's on them to break the chain of causation, and they haven't done that. It's a legal question. It's not a proof question. So it is susceptible to decision at a motion-to-dismiss stage. Proximate cause is always a legal question. I agree that it is always a legal question, but I also think that the burden is on them to break the chain of causation, and that the test is— I don't think it requires breaking the chain of causation. It just requires a policy argument that there's too much attenuation. There's not a direct line. Too many inputs into the ultimate decision here that brought about the enactment of this legislation means that proximate cause is not established. I think you're right that it's a policy question. I agree with that part of the question. I think if you go back to the first panel opinion in Empress, which was up on the motion-to-dismiss, and I understand that it got vacated by the en banc opinion on the jurisdictional bar piece, but in that, this court held that proximate cause was adequately alleged as to both acts, as to both the 06 Act and the 08 Act. And on the 06 Act, it was all about legislation. Ultimately, it was a failure of proof on the 06 Act. They didn't prove a bribe, and they didn't prove undue influence. But the court actually, on the second go-around at the panel level, the court actually revisits the kind of proof that would have been needed, and it talks about testimony from legislators delving into all of these issues. And so the same multi-step process would have had to happen for the 06 Act. The court didn't say it wasn't adequately pled. The court said you failed at the proof level. No, and this returns me to my original question, which is that there is a material difference between the speaker's authority and the governor's authority. The governor has, and at issue there was Governor Blagojevich, and the governor has singular authority to sign or not sign a bill into law. And that's – again, it doesn't map on quite to the case that we have here, which concerns the acts of one legislator. Granted, a very powerful legislator in a position of leadership and authority with control over his members, he doesn't control the Republicans. Right, but we don't get into vote counting, and that's the Beader case that says you don't have to get in. Once you get into vote counting, there's a problem, but you don't have to get into vote counting. And so the focus from our perspective, I think there's two ways to look at it. The first and cleanest is that we've alleged that he is, in effect, the governor or has the power equivalent to the governor. And Empress Casino uses the language, the governor or anybody else. And again, I would say if Mike Madigan isn't anybody else, then there's nobody else who is anybody else when it comes to legislation. Does the Senate create a problem here for you? Does the bicameral legislature create a problem for you? I don't think so. What facts do you allege that are not conclusory that he has control over the Senate, that he can get legislation through the Senate? So we allege that he had control over the entire Assembly, right? And as a gatekeeper, if it doesn't get – right, well, we have to prove it. I understand we have to prove it, but the allegation is that he has control as a gatekeeper. And we know that because they tried to get him to enact this before, and he said no. So he never let it come to vote in the Assembly, right? I mean in the House. That argument is a little bit of a red herring. I understand what you're saying, but unfortunately, across the country, we have legislators that are bribed and council members that are bribed, etc. And a lot of times, these are the lower-level guys that are bribed. It's not always the Madigans that are bribed. So ComEd may have had several reasons for bribing him. One is, of course, his position of authority. But he may not have been the only member that they were bribing. And to just say they would pick the person that could get the legislation done is – I don't just accept that, because then no other legislators would be bribed unless you could actually get the job done. And we know from history that is not the case. There are folks that bribe legislators for their vote and their perceived influence all the time. And that's my question on the Senate. What facts are there that you allege that we can say there's enough here in the complaint to factually determine that Madigan has control over the Senate? I believe – and I'll try to get the precise site I'm looking at. I don't have it in front of me, but I'll try to get to it on rebuttal. I believe our allegation is that he controlled not just what came into the House, but that as the chair of the Democratic Party, the guy who ran the machine, he controlled both sides of the legislature. That he was in a position to control both sides. But we also allege that it would never have come to a vote on the House side. Well, that's but for possession. Right. That's a necessary condition but not sufficient. Right. But the fact that – again, the fact that more things have to happen. It's like the arsonist, right, who lights a fire in the wind and the wind picks it up. The fact that more things have to happen doesn't dispose of proximate cause. And I guess I would come back on the proximate cause point to the policy behind it. Because I agree with you, it's a policy argument, Judge Sykes. And I think that the policy behind it is we start with the principle in the law that a wrongdoer, especially an intentional wrongdoer, is responsible for the consequences of their act. And then proximate cause comes in and says, well, is there some special reason why this defendant isn't liable to these plaintiffs? And that's where you get into the language from the Supreme Court cases about intended victims, foreseeable victims. Are they the direct victims? Are they the only victims? And we satisfy all of those. So we don't have any of those other problems here. So when you think about it from that perspective, that proximate cause is a question of policy. Is there a special reason to let this defendant off as to these plaintiffs? Here, they bribed Mike Madigan for a reason. He was the most powerful guy. He had blocked what they wanted to do. They bribed him and only him. And it caused the legislation to pass, and they got what they wanted as a result of which they injured these plaintiffs. If your claim survived the motion to dismiss stage, would the legislative process underlying those two acts, well, the amendments and the act and then the second act, be subject to scrutiny by a court? It's a very good question, and that's the Fletcher question, I think, as I hear you. And I think the answer is under Empress, it's permissible to do that. Empress talks about looking into all of that kind of evidence. Empress says on the 06 Act, you might have found this and you might have found that and you might have found the other, but you didn't find any of it, failure of proof. So I do think that it would be permissible. I don't know that it's necessary because I think that, and I understand that it reads more like but-for causation, but I think we will be able to establish that he was the gatekeeper, and it only happened because of him, and that's why they bribed him. So I think either way, we're okay. I think if it's necessary to get into that, we'll get into it, and we'll get into it on summary judgment. If you would address the filed-rate doctrine. Yes. Back to Judge Cushman. So the filed-rate doctrine. Very briefly, no other case has gone as far on the filed-rate doctrine as ComEd asked this court to go and certainly not on a motion to dismiss because the claim here is that ComEd bribed its way around the regulatory agency. And not that they bribed the regulatory agencies, but they bribed their way around, and that as a result, the regulatory agencies had no meaningful authority. And that's the test under Arsbery. Well, the rates pursuant to these two pieces of legislation had to be filed with the ICC. There's no question about that. There's no question about that. The question then becomes what authority did they have. Now, you have to separate the two, right, because EMA was mandated spending and mandated returns, and those look more like rates. But the only authority that the ICC had was at the margins. Nothing that was mandated by statute could be disapproved. They give you some examples. Those are all things that weren't mandated by the statute. So, yeah, at the margins, they had some authority, but they had no meaningful authority over these rates. FEJA is different. FEJA was a corporate bailout by way of electricity bills. Those weren't rates. Those were simply a mandated every customer in Illinois is going to pay this fee to Exelon, and it's going to be collected by way of electricity bills. So we don't think any other case comes close to this. The ICC doesn't have anything to do with those filings once they're filed. Is that what you're saying? The ICC has said expressly, and this is in the record below, we put in letters from the ICC saying we couldn't have handled this. Nothing that you've alleged could have been addressed here or could still be addressed here, and, of course, that means they couldn't be addressed by judicial review. All of their authority was taken away, and if the filed rate doctrine doesn't swallow up the entire universe, there has to be something outside of it, and we think this case, like the Wortman case we put in front of the court yesterday, and I apologize for the late submission, same idea. If you take away the authority, if there's no authority, there's no filed rate doctrine, and we've pled that there's no authority. Whether or not we can prove that, that's for some re-judgment. What about the foundational rationale for the filed rate doctrine, which is that courts should not be in the business of rate setting? I agree with that, and that's clearly the rationale. The court is not setting any rates here in our case. All that's being done is evaluating whether or not there's a RICO violation and then measuring damages. What are the damages? The starting point is the $150 million they pled to in the DPA. We know at least $150 million they took, so that can be a starting point. What our measure of damages is and how we quantify that is something we don't have to do at motion to dismiss. You don't even really have to do it at summary judgment. That comes up at trial, and that's the BCS case. We're not required now to know exactly what our measure of damage looks like. Thank you. Thank you, Your Honor. Mr. Price. Your Honor, and may it please the Court, Matthew Price on behalf of ComEd and Exelon. Three doctrines require dismissal of plaintiff's complaint, separation of powers, proximate cause, and the final rate doctrine. I want to talk about each of these, but before I do, I want to make a couple of overarching points that really cross-cut all three doctrines and go to the core of the case. The first is that private litigants are not allowed to seek civil damages from the effects of a concededly valid, unchallenged state law based on allegations of improprieties in the legislative process,  which requires courts to treat a duly enacted law as binding unless the law is unconstitutional, and it's also reflected in the proximate causation case law, which doesn't allow a plaintiff to trace causation through a legislative process, a state legislative process. This principle compels dismissal here because plaintiffs claim injury from paying electric rates that were authorized by concededly valid, unchallenged state laws based solely on allegations about the legislative process. The second cross-cutting point is that private litigants are not allowed to seek damages from paying rates, and that's because a court would need to speculate about what rates would or should have been in the absence of the alleged wrong in order to award damages, and both proximate cause and the final rate doctrine both bar that kind of claim. Here, plaintiffs paid electric rates for the last decade reflecting investments in things like grid hardening, digital meters, and clean energy, and even without IAIMA and FEJA, some rate would have been charged. For electric service, but the court has no way to determine what that rate would or should have been. So in the end, plaintiffs have really brought their claims to the wrong branch of government. The criminal law deters and punishes bribery, and ComEd paid a $200 million criminal penalty in connection with its DPA. If the legislature is dissatisfied with the laws that it enacted, it can change the law, and here the legislature comprehensively revisited the state's energy policy after the DPA, and it did three things. First, it left FEJA and IAIMA in place. Second, it expanded the state's support for nuclear energy. Third, it directed the ICC to investigate what had occurred and whether ComEd had charged customers for costs that were not lawfully recoverable in rates and authorized the ICC to order refunds if it found such charges had occurred, and that proceeding is ongoing. So the legislature took the action it deemed warranted, and plaintiffs might have wanted a broader remedy, but the broader remedy is not one to be found in a civil class action. It's to be found in the political branches. So beginning with separation of powers. Since Fletcher, it's been a bedrock principle that the court has to give force and effect to a duly enacted and constitutional law and can't entertain a civil damages action that collaterally attacks the legitimacy of the law based on allegations of legislative improprieties. If the plaintiffs came to the court and said these laws are invalid, the claim would obviously be dismissed, but the same conclusion holds when they say they give us damages for what these laws require because they're illegitimate because of the process by which they were enacted. What's your best modern application of the Fletcher principle? Well, I think we see the Fletcher principle, for example, in the state action doctrine in antitrust, where you have a state action that is procured through bribery, and in the city of Columbia case, for example, the court cited Fletcher as an example why it doesn't allow that kind of claim to proceed, and it doesn't allow you to look behind the state action at how it came into being. And we also see in Empress, frankly, we see the court, albeit truly in dicta, because the court found it easier to resolve the case on the proximate cause record that it had before it, but we see the court citing Empress for the same proposition. But if Fletcher was the absolute bar, you're suggesting that it is the single claim that was permitted to go forward in the second round of the Empress litigation would not have been permitted to go forward. Well, Fletcher is not jurisdictional, Your Honor. It's a merits issue. Understood. But if it was a legal bar, as you're suggesting, then that would have trumped the proximate cause finding of the panel, right? The Fletcher argument actually wasn't raised in the briefs below, in the briefs by Apolli. It was raised by the court. So the court raised that issue itself, but then resolved the case on the arguments that were presented to it by the parties. Do you have a case where Fletcher has been applied and it's the defendant who engaged in the offending conduct as opposed to a third party? And does that matter? Well, sure. So a city of Columbia is an example where the court applies the Fletcher principle to a situation where the defendant is the entity that procured the corrupt governmental restraint on trade. And then Empress, of course, is another example where the defendant is the one who committed the bribery. And I think if you look at Fletcher versus Peck itself, there's really two holdings in that case. The first is about whether this law that was procured by bribery that transferred a bunch of property could be collaterally challenged in a civil action. And the court says, no, it can't. And then the second part of the case goes on to say, now the Georgia legislature actually tried to enact a remedy where it retroactively nullified the law that the Supreme Court said needed to be given force and effect. And the Supreme Court held that couldn't be applied. That was unconstitutional because it was an ex post facto law, and in that context emphasized the nature of the parties that they were innocent. But the first part of the decision about needing to give force and effect to a law, regardless of how it comes about, the Supreme Court doesn't mention the nature of the parties at all because it's not what's important. That part of the opinion is about the proper role of the court in a democracy. And a court, when it's faced with a validly enacted law, needs to give that law effect. There are no laws with asterisks in our democracy. It's a problem for the legislature to fix, and the Supreme Court's reasoning in that case makes that quite clear. Plaintiffs have talked about a hijack exception. If you look at Empress, it says the court accepts that quote for present purposes before it goes on to analyze the evidence that it was presented with in that case. I don't think the court can be read to endorse that as the law. And there's a good reason for that, because if you had a hijack exception, it kind of would swallow the rule. First of all, what does it mean to be hijacked? You need to prove that by dissecting legislative motivation and process, which is exactly what Fletcher condemns. And if an alleged bribery of a powerful legislator were enough to open discovery into the legislative process, you would routinely have depositions of legislators, legislative staff, subpoenas seeking legislative materials, regular federal court interference with the state legislative branch, which Fletcher doesn't want to allow. And finally, it disrespects the presumption that legislators act independently and in good conscience and are not a cat's paw. And this notion that this shifts to proximate cause, but his notion that as long as they can prove that the gatekeeper kept the gate, everything else was like a wind, that disrespects the idea that there are scores of legislators who are presumed to exercise their independent judgment, a bedrock presumption of democracy. And in the Brnovich case by the Supreme Court recently, the court emphatically rejected that kind of argument and said that we cannot assume that legislators are dupes or mere tools. And we reject a cat's paw theory of liability based on an improper motive by one legislator. I take part of plaintiff's argument to be that some of that may well be true, but it's simply too early for all of that. So what's your response? So that shifts to proximate cause, because obviously the Fletcher argument is a legal barrier. With respect to proximate cause, which is also a legal barrier, it's not too early. And the test for proximate cause in this case is directness. That's what the Supreme Court has emphasized again and again. It's not foreseeability. It's not intended victims. It's directness. Is there a direct relationship between the alleged wrong and the ultimate injury? And the test for directness in the context of this kind of act is given by Empress in how the court analyzed the 06 Act. And the way Empress looked at it is that you need to show an improper influence by the bribed individual over the other legislators in order to trace causation through that process. You need to show an improper influence. And that's because if there's no improper influence, then there's no reason to believe that the legislators who voted for it acted in anything other than their independent appropriate judgment. And so if you look at Empress, for example, on page, I believe this is 730, it says there are allegations that the governor who had been bribed met with unnamed legislators while the bill was under consideration. And the legislators switched their votes and so forth. And the court says, well, we don't know what kind of promises the government made. And if the promise was referred to support for re-election or a commitment to co-sponsor a bill without any taint of bribery, that is bribery of the other legislators, nothing would be wrong. That's just part of the legislative process. So they need to allege improper influence on other legislators. And there is nothing in the complaint that is well pleaded that alleges anything of that sort. And so for that reason, we think that the proximate cause can't be shown and is not shown by the allegations in the complaint. Mr. Price, could we affirm this case without getting into Fletcher and without getting into proximate cause just on the filed right doctrine? Yes, and that's a great segue. It would be my question for you, and I'd like you to address the Future Energy Act of 2016 specifically. What I understand is the Illinois Power Agency charges ComEd for zero emissions credits. And the Illinois Commerce Commission reviews the charges passed on by ComEd. But I think what the Illinois Commerce Commission here does is not much. We have cases, I think, as recently as 2000,  As long as the role of the legislature is not completely eliminated here, the regulatory body is not completely eliminated, that's enough. But what did the Illinois Commerce Commission do that would permit us to affirm on the filed right doctrine? Sure. So a few answers, Your Honor. The first answer is, with respect to what they did, they were involved in the procurement process to decide which nuclear plant should receive the credits in the first place. The IPA proposed a procurement plan for how it would figure out which applicant plants would meet the public interest criteria of the statute. The ICC then reviewed that plan and approved that plan after receiving public comment. And the next thing it does is authorize the tariff to recover the amount of the credits and ensure that those credits are appropriately applied and billed to customers. So I would say, I'm sure my appointment will say, well, that's purely ministerial. It's still important. They exercise continuing regulatory oversight to ensure that the utility is charging what its tariff says should be charged and no more and no less. And that's a role that the regulatory agency plays. But I think you're right, Your Honor, that this court's case law makes very clear in cases like Goldwasser and also the Supreme Court's decision in Square D that the amount of legislative, the amount of regulatory agency oversight is irrelevant to the filed right doctrine. What matters is, are the rights filed? And if they're filed, the filed right doctrine applies. And there are a few reasons why that's so. The first is that a tariff constitutes legal authorization to charge a rate and also a legal obligation to charge the rate on behalf of the utility. It's akin to a statute. And you can't collaterally attack the filed right through a damages action. Now, there are echoes of Fletcher here, I think, in terms of how courts have understood the filed right doctrine over time. But the second reason is that there's no injury to property, which is the phrase required under RICO, no injury to property by paying just and reasonable rates for utility service. Because that's all customers are entitled to. And here, there are annual orders by the ICC under IAIMA, finding rates just and reasonable. And we have a legislative determination by the legislature that the zero emissions credit charges were appropriate to be charged to customers. The third point is, it's important to remember that regulatory agencies exercise delegated legislative power. They're creatures of the legislature. And their authorization to review expands and shrinks as the legislature sees fit. In some contexts, the legislature will delegate broader authority. In other contexts, the legislature may delegate less authority. But the filed right doctrine doesn't depend on how much legislative authority the legislature has delegated in any particular case or to what degree the agency has exercised that authority. Because if it did, every case involving the filed right doctrine would end up getting mired into complex debate about, well, how broad is the delegation? Is it broad enough? How much did the regulatory agency really do? And if that is what the filed right doctrine ends up becoming, you no longer have a rule. You have a morass in every case where you have retrospective inquiry by a federal court into a state agency and a state legislative structure for how the state has chosen to structure its utility regulation. And we talk, for example, about we cite the Duquesne case where the Supreme Court recognizes that rate setting is a legislative power. And the idea of just and reasonable ultimately is a legislative judgment. So if the legislature wants to keep that judgment for itself in order tariffs to be filed accordingly, that's permissible for it to do. And the filed right doctrine still applies with full force and effect. And the fourth point is the filed right doctrine, a core reason for it is a lack of judicial competence to determine what damages are, i.e. what proper rates should have been. Now, with respect to EIMA, I think this is blatantly clear to see what the problem would be. You have investments for 10 years that provide an electric service. And the ICC would have needed to find some rate just and reasonable during that period. And we have no idea how to even begin to think about what rate that would have been. And the court doesn't have competence to make that determination. But it's true for the zero emission credit charges and for FEJA as well. Because if there weren't zero emission credit charges, those charges, the purpose of them was to prevent nuclear retirements. Without those charges, the entire electric market would have looked differently. The price the customers paid for electricity would have been different. And we would have to engage in a very complicated retrospective analysis to try to figure out, well, what would that price have been? What rates overall would customers have paid? And it's that very intricate and complex inquiry that the Supreme Court, under the Proximate Case Law, says shouldn't proceed. And that's a case like ANZA. And under the Filed Rate Doctrine, the court doesn't entertain and doesn't go into. So unless there are further questions on those subjects, we ask that the court affirm. Thank you very much. All right. Thank you very much. Mr. Selvin, your time had expired. But you had three minutes in rebuttal. We kept you at the podium with a lot of questions. Thank you, Your Honor. I have one cite for you, Judge Kirshen, and four very short points. The cite for you on control of the Senate is paragraph 142 of the complaint regarding him being the leader of the party and the effects of that. Paragraph 145, that he was able to control every Democrat in the Assembly. I'm summarizing. I'm not reading. I understand. Yes. Paragraph 146, that virtually all major legislation in the House as well as the Senate was under his control. That's at the short appendix 40 to 41. I want to address filed rate a little bit, because I believe everything my friend said are arguments about what's going to happen on summary judgment when that issue is fully joined. None of that is in the record. None of the issues about the authority of these agencies to deal with these issues in the record. We have pled that it was all stripped away from. But we can take judicial notice of that, right? We can just look at the legislation creating the bias. You can look at the legislation, and that's why we've addressed it. And we've pled that the legislation has stripped the authority. Again, particularly with respect to the ZEX. Because that's just a pass-on. Literally just a pass-on. There may be good reasons for it. The legislature may have had good reasons for it. But from the filed rate perspective, that's not a rate. It's a pass-on. It's a corporate bailout by way of electric bills. And the problem with all of this is that if you can bribe your way around the agency authority, and that's what we allege happened here, and the filed rate doctrine protects you, there's no reason in the world the company wouldn't do it. Well, that's not true. Because it just protects you from civil damages. It doesn't protect you from criminal prosecution, as ComEd knows. That's right. It doesn't protect you from changes in the legislation, as ComEd now knows. It doesn't protect you from legislative refunds to utilities. It just protects you from things like RICO damages brought by private plaintiffs. Right. But what doesn't happen in any of those things is the harmed parties don't get compensated, right? And so what you're bribing your way out of is having to give the money back to the people you stole it from. But the problem then is you're only giving money back to part of the people who were defrauded, right? Because what you have is some customers, in this case, let's say this case was to go forward and you were to win the case, ComEd's customers would get a refund, presumably, or would get some form of damages for the amount that they overpaid in electricity costs or whatever you want to call it. But the other customers of other companies in Illinois would not. So this is the price discrimination issue. And as I know you know, the fact that this is a class action is not dispositive of this issue, but it is helpful, right? And as I indicated in the companion state court case, claims of these other customers have now been joined in the litigation against ComEd. Not against, it's not Ameren's fault. They didn't bribe anybody. But we would do the same on remand here. We would amend our class to include all customers, because everybody in Illinois paid these rates. And we've excluded the judges from our class. So I want to address two other points very quickly. The fact that it's an indirect attack on legislation that you couldn't do directly, that was Empress. In Empress, the first attack was they went after the legislation as unconstitutional. And they were told they couldn't do that. And so when they lost that, they came back and filed a private damages action, and that was allowed to go forward. So I don't think that changes anything here. Last point is the post-DPA legislation that my friend mentioned. The fact that legislation would have passed anyway is not a defense. And that is Empress Casino, 763 F3rd, 732 to 733. If it would have happened anyway, that does not absolve an intentional wrongdoer of their misconduct. We would ask that the court reverse on all three issues. Thank you. Thank you very much. Thanks to both counsel. The case is taken under advisement.